113 610
204 500
113 610
206 403
206 533
113 610
213 283
213 376
113 610
218 568
34 SC 394
113 610
36 SC 290

## Lehigh Valley Railroad Co. *versus* Brandtmaier.

1. It is the duty of a railroad company, in the running of its trains, to exercise care according to circumstances; and, where the railroad track crosses a much traveled street or highway, the company as well as the public, is bound to exercise a degree of care reasonably commensurate with the danger. It is the duty of the company, on the one hand, to give some sufficient notice of the train's approach, and to moderate the speed of the train to such a rate as under the circumstances is reasonably consistent with the public safety. On the other hand it is the imperative duty of the traveler to stop, look, and listen for approaching trains before attempting to cross the railroad track.

2. Where particular instructions on a given point are not asked for, the case will be reviewed upon the general effect of the charge, and not upon sentences or paragraphs selected from it. If, as a whole. the charge was calculated to mislead, there is error in the record; if not, there is none.

3. Reeves *v.* D. L. & W. R. R. Co., 6 Casey, 454, followed.

April 14th, 1886. Before Mercur, C. J., Gordon, Paxson, Trunkey, Sterrett, Green and Clark, JJ.

Error to the Court of Common Pleas of *Luzerne county :* Of January Term 1886, No. 392.

This was an action of trespass on the case brought by Ludwig Brandtmaier against the Lehigh Valley Railroad Company to recover damages for injuries sustained by the alleged negligence of the defendant in running their cars at a public street crossing in White Haven whereby he was run into. Plea, not guilty.

The following facts appeared on the trial before Rice, P. J.

On the evening of March 3d, 1886, about 8.45 o'clock the plaintiff attempted to cross the railroad track of the defendant with his horses and sleigh at Berwick street, in the town of White Haven, a town of about fourteen hundred inhabitants. He was struck by an engine and suffered serious injuries. There was much conflict of testimony as to the rate of speed of the train; the plaintiff's witnesses testifying that the rate was from 15 to 25 miles per hour, while the defendants testified that it was from 8 to 10 miles per hour. The plaintiff testified that before crossing the track he stopped, went upon the track, looked and listened and returned to his sleigh and immediately drove upon the track when he was struck by the defendants' engine. The defendants offered testimony to show that his statement as to having stopped, looked and listened was not correct. There was also a conflict of testimony as to whether the defendant had given warning of the approaching train by ringing the bell or blowing the whistle.

Berwick street crosses the railroad at right angles about 240 feet below the further end of the station at which the train was about to stop. The next street below Berwick, or on the other side from the station, is Northumberland. From Berwick to Northumberland is 376 feet. From the crossing at the former there is an unobstructed view of 570 feet. The station for blowing the whistle, spoken of as the Point of Rocks, is 1400 feet below Berwick street.

The defendant presented, *inter alia,* the following points:

1. Under all the evidence in the case the plaintiff cannot recover.

Answer:—"I decline to so charge you." (Sixth assignment of error.)

2. It was the duty of the plaintiff in approaching the railroad crossing to stop, look, and listen immediately before crossing, and as the view of trains coming northward was obstructed until the crossing was reached, it was his duty to stop, look, and listen at the crossing, and if necessary to lead his horses over.

Answer:—In one view of this language it is a correct statement of the law as applicable to the case. In another view I have some doubt whether it would be the duty of the Court to hold it well taken. It is, of course, law that the plaintiff should have stopped, looked and listened immediately before crossing the track, and if he could not see up and down the track from any point upon the road before reaching the rails, it was his duty to go upon the track itself for this purpose, and look, and listen before attempting to drive his team across. His failure to stop, look, and listen at a point where he could do all these things, would be negligence on his part and would prevent his recovery.

If, however, you believe that he left his team eighteen or twenty feet from the track and that he did go upon the track himself, and did look and listen for the approaching train, and that he went back to his sleigh after failing to see or hear any train approaching, I decline to charge you that as matter of law, it was his duty to stop, look and listen again or a second time, immediately before crossing the track.

I do not wish to be understood as qualifying in any degree what I have said before, as to his imperative duty to stop, look and listen at a point from which he could see and hear immediately before crossing the track.

I leave it to you, however, to say whether or not he did do this. (Seventh assignment of error.)

In the general charge the Court instructed the jury, *inter alia,* as follows:

The plaintiff supports his claim that the defendant failed to

exercise ordinary care in the running of train No. 12 upon the night of March 3d, 1884, by two allegations. First, that the train was running at an improper and unusual rate of speed; and second, that no notice of its approach was given either by the ringing of a bell or the blowing of a whistle.

First as to the rate of speed. You will remember the conflicting testimony as to the point, and will bear in mind in considering the estimates of witnesses not only the reliability of the witnesses themselves, but also their means of knowledge and relative intelligence. The engineer, fireman, and other witnesses for the defence swear that the train was not running over eight or ten miles an hour, while other witnesses for the plantiff put the speed as high as fifteen, twenty or even twenty-five miles an hour. You must weigh the testimony and judge for yourselves, which is most likely to be correct.

In this connection you will consider the point at which the train stopped after the accident, I mean the distance from Berwick street, which the train ran after the accident.

When you have ascertained what the rate of speed was, you will then consider whether it was an unreasonable rate. There is no fixed rule which can guide you here. The duty of a R. R. Co. as to the speed of its trains of course varies with the locality. What would be safe at one point would be imprudent at another. What might be a perfectly proper speed at a crossing of a country road would be highly improper in crossing the streets of a town or village. The duty of care in the rate is also affected by other considerations. [Was the crossing so guarded as to make a high rate of speed safe? If a crossing is guarded either by a flagman or by a gate, it might be that a very high rate of speed would be comparatively safe. (Second assignment of error.)

You will also consider the character of the highway itself; its location in the town of White Haven, and the amount of its use by the citizens as compared with other streets.

When you have determined the rate of speed, you will then consider whether any notice of the approach of the train was given.

There can be no question, and it is not disputed by the defendant, that there is an imperative duty upon them to warn the public of the approach of their trains at this crossing. The duty may not perhaps be so imperative when a road crosses their tracks in the open country, but in village or town there is no dispute upon the point, especially where, as in this case, the view up and down the track is obstructed by buildings until within a short distance from the rails.

You will consider, therefore, whether upon the night of this accident a proper notice of the approach of this train was given.

1886]      OF PENNSYLVANIA.      613

[Lehigh Valley Railroad Co. v. Brandtmaier.]

[Was a whistle blown? and was a bell rung? If so, was this done properly. There is a conflict of testimony upon this point and you must decide, bearing in mind what I said before upon the means of observation of the various witnesses, and the comparative weight to be given their testimony.] (First assignment of error.) Some of the plaintiff's witnesses testified positively that no whistle was blown or bell rung; others, that they did not hear it; and on the other hand you will recollect the testimony of the defendant's witnesses, who told you they heard both the whistle blown and the bell rung.

[In case you should be of the opinion that the defendant had exercised every care in guarding this crossing, or of giving proper warning to travellers of the approach of its trains, and that the accident which resulted to the plaintiff could not have been prevented by any act of the defendants, then, of course, that would be an end of this case.] (Third assignment of error.)

If, however, you should be of the opinion that the accident was due to the negligence of the defendant, then you will also consider whether the plaintiff contributed to it by any want of care on his part. Because the rule of law is well settled, that if the plaintiff was guilty of any contributory negligence, he cannot recover even if the defendant was also guilty; the law cannot determine whose fault was the greater.

There is an imperative duty upon all travellers to stop, look and listen before attempting to cross a railroad, and this duty becomes greater and more imperative wherever a crossing is dangerous, or a view of the track is obstructed.

You will recollect the testimony of the plaintiff himself in describing the occurrences immediately before the accident.

According to his statement, after attending to his business in the village, he walked up Berwick street, followed by his team, toward the railroad. His man was driving the sleigh and stopped about eighteen or twenty feet from the track, while Mr. Brandtmaier walked on to the track, looked up and down, and not seeing or hearing any train, he came back to his sleigh, got in, and was driven up to the track, and was struck by the approaching train.

The driver and horses were killed, and he was injured in the manner described to you.

[The defendant alleges that he failed to do all that he says he did, and has introduced witnesses who have related to you circumstances which the defendant claims are inconsistent with such action on the part of the plaintiff. You will consider the credibility of these witnesses, and also whether the circumstances they relate were inconsistent with what the plaintiff swears he did. These are all pure questions of fact,

and must be determined solely by you.] (Fifth assignment of error.) In case you find the defendant guilty of negligence, and also that the plaintiff did not take proper precautions to ensure his safety, then, as I have told you, he cannot ask for compensation for his injuries from the defendant.

In case you find that the defendant failed in its duty, as I have pointed it out to you, and also that the plaintiff did all that a prudent man should have done, then the plaintiff is entitled to a verdict.] (Fourth assignment of error.)

If you find in favor of plaintiff, he is entitled to compensation for the damages done to his property, and also the cost of medical attendance and nurses.

Verdict for the plaintiff in the sum of $6,000 and judgment thereon, whereupon the defendant took this writ, assigning for error the answer of the Court to defendant's points, and those portions of the general charge included within brackets.

*J. V. Darling* (*E. P. Darling, H. W. Palmer* and *G. L. Halsey* with him), for plaintiff in error.—There is no common law duty on the part of a railroad company (irrespective of circumstances in the particular case) to station flagmen or maintain gates at public grade crossings: Phila. & Read. R. R. v. Killips, 88 Pa. St., 405; Stubley v. London &c., R. R. Co. L. R., 1 Exch., 13; and see cases cited in 2 Wood, Railway Law, 1313, n. 4.

Where the statute makes it the duty of a railroad company to give signals—as to ring the bell or blow the whistle on a train approaching a crossing—it is negligence *per se* for it not to do so; but otherwise not: 2 Wood, Railway Law, 1319.

Failure to blow whistle or ring bell, not negligence *per se :* Kelley v. Hannibal &c., R. R. Co., 13 Am. and Eng. R. R. Cases, 138.

Aside from statutory or municipal regulation, no rate of speed at which a railroad train may be run is negligence *per se :* Powell v. Missouri Pac. R. R., 8 Am. & Eng. R. R. Cases, 467.

When the rate of speed at which a railroad car is run across a street is shown, it is for the jury to say whether, with regard to the safety of the public, that rate was reasonable: Howard v. St. Paul, &c., R. R., 9 Am. & Eng. R. R. Cases, 283. And see the notes to this case and R. R. Co. v. Ritchie, Id., 275, on the point that no rate of speed is negligence *per se.*

Although the leading doctrine of the cases of Phila. & Read. R. R. v. Long, 75 Pa. St., 257, and Penn. R. R. v. Lewis, 79 Pa. St., 33, may be regarded as overruled by the later line of authorities, of which Cauley v. P. C. & St. Louis R. R., 95 Pa.

St., 398, and Moore v. Penn. R. R., 99 Pa. St., 301, are instances, yet the earlier cases recognize the principle that the rate of speed in relation to the question of negligence, is for the jury.

Where a traveller is injured in crossing a railway, negligence is not to be presumed against the company: Penn. R. R. Co. v. Goodman, 62 Pa. St., 329 (1869); Button v. Hudson River R. R. Co., 18 N. Y., 248.

An instruction that it is the duty of a railway company to give "due warning" of the approach of its trains to a highway crossing, is erroneous; being too general: Chicago &c. R. R. v. Robinson, 106 Ill., 142; Weber v. N. Y. Cent. & Hud. Riv. R. R., 58 N. Y., 51; s. c., 7 Am. Rwy. Rep., 188; West. & Atlantic R. R. v. King, 19 Am. & Eng. R. R. Cases, 255; Maryland Cent. R. R. v. Newberry, Id., 261; Smedis v. Brooklyn & Rockaway R. R., 8 Id., 443.

A charge which is calculated to mislead the jury is erroneous: Stall v. Meck, 70 Pa. St., 181.

When the effect of the whole charge is to mislead, this Court will reverse: Penn. R. R. v. Berry, 68 Pa. St., 372.

The statement of an erroneous principle of law to the jury, which had a direct operation on the evidence, and withdrew their attention from other points, is ground for reversal: Deal v. McCormick, 3 S. & R., 343; Gregg Township v. Jamison, 55 Pa. St., 468; Bisbing v. Third National Bank, 93 Pa. St., 79.

We submit that the defendant below was entitled to have the first point affirmed and the case taken from the jury.

The plaintiff undertook to show that he had "stopped, looked and listened." He might have rested upon the presumption, which exists in the absence of any testimony, that he had so looked: Schum v. Penn. R. R. Co., 11 Out., 8.

But having undertaken to show how he stopped, as well as the fact that he did stop, he was bound to establish that fact as a part of his case: Reading & C. R. R. v. Ritchie, 6 Out., 425.

The plaintiff did not stop, look and listen within the meaning of the rule: C. R. R. of N. J. v. Feller, 3 Norris, 226.

*William S. McLean*, for defendant in error.—The plaintiff in error contends that the plaintiff below was guilty of contributory negligence *per se*, and which should have been declared such by the Court, as matter of law. This is the pinch of the case.

This contention would be sound if there were a fixed invariable standard of duty under the circumstances, and a failure

on the part of the plaintiff below to fully comply with it: Beach on Cont. Neg., § 163, p. 450.

But if there were no fixed, invariable standard of duty, under the circumstances, then the question whether the plaintiff below contributed to the injury was for the jury: Beach, *ut supra.*

One about to go over a railroad across a public highway shall stop, look and listen before crossing, not immediately before crossing: Penn. R. R. *v.* Beale, 23 P. F. S., 506; Penn. R. R. *v.* Ackerman, 24 Id., 265; Penn. R. R. *v.* Weber, 26 Id., 157; Central R. R. *v.* Feller, 3 Norris, 226; Pierce on Railroads, 344.

Mr. Justice CLARK delivered the opinion of the Court, October 4th, 1886.

It is the duty of a railroad company, in the running of its trains, to exercise care according to the circumstances, and where the railroad track crosses a much travelled street or highway, the company, as well as the public, is bound to exercise a degree of care reasonably commensurate with the danger. It is the duty of the company, on the one hand, to give some sufficient notice of the train's approach, and to moderate the speed of the train to such rate as, under the circumstances, is reasonably consistent with the public safety; on the other hand, it is the imperative duty of the traveller to stop, look and listen for approaching trains, before attempting to pass over; if he neglects this legal duty, or knowingly attempts to cross in front of a rapidly moving train, he takes his life in his own hands and assumes the risk of personal injury. The law does not designate the mode in which these precautions against injury, on part of the company, are to be exercised; there is, it may be conceded, no common law duty on part of the company to station flagmen, or to maintain gates, at public grade crossings, unless, indeed, under the particular circumstances, the public safety cannot ·otherwise be reasonably secured; but the fact that flagmen are not stationed at such a crossing, and that gates are not there maintained, are matters proper to be considered, with other facts, in a given case, in determining the rate of speed which is reasonably consistent with the public safety. It was alleged in the Court below, at the trial of this cause, and there was some evidence to show, that the train crossed Berwick street at an improper ·and an unusual rate of speed, and that no notice of its approach was given by the ringing of a bell, blowing of a whistle or otherwise. The learned judge very properly submitted both of these questions to the jury. In his charge, after reciting

the evidence bearing upon the question of the rate of speed, he says:

" When you have ascertained what the rate of speed was, you will then consider whether it was an unreasonable rate. There is no fixed rule which can guide you here. The duty of a Railroad Co., as to the speed of its trains, of course varies with the locality. What would be safe at one point would be imprudent at another. What might be a perfectly proper speed at a crossing of a country road, would be highly improper in crossing the streets of a town or village. The duty of care in the rate is also affected by other considerations. Was the crossing so guarded as to make a high rate of speed safe? If a crossing is guarded, either by a flagman or by a gate, it might be that a very high rate of speed would be comparatively safe. You will also consider the character of the highway itself; its location in the town of White Haven, and the amount of its use by the citizens as compared with other streets."

" When you have determined the rate of speed, you will then consider whether any notice of the approach of the train was given. There can be no question, and it is not disputed by the defendants, that there is an imperative duty upon them to warn the public of the approach of their trains at this crossing. The duty may not perhaps be so imperative when a road crosses their tracks in the open country, but in village or town there is no dispute upon the point, especially where, as in this case, the view up and down the track is obstructed by buildings until within a short distance from the rails. You will consider, therefore, whether upon the night of this accident, a proper notice of the approach of this train was given. Was a whistle blown? and was a bell rung? If so, was this done properly? There is a conflict of testimony upon this point and you must decide, bearing in mind what I said before upon the means of observation of the various witnesses, and the comparative weight to be given their testimony. Some of the plaintiff's witnesses testified positively that no whistle was blown or bell rung, others, that they did not hear it; and on the other hand, you will recollect the testimony of the defendant's witnesses, who told you they heard both the whistle blown and the bell rung."

No fault can be found with this instruction; its correctness, we think, cannot be questioned. The crossing was in fact not guarded either by a flagman or a gate, and if the street was one extensively travelled and the train's approach could only be seen for a distance of five hundred and seventy-five feet, a very high rate of speed, in the absence of those precautions, might well be considered unsafe; but whether the street at the crossing was one much travelled, whether any proper

signal was given, what were the probabilities of danger from personal injury, and what rate of speed was fairly compatible with the public safety, were matters for the consideration of the jury, and we think these questions of fact were fairly submitted. The fact that some persons say they heard the signals, and others that they did not hear them, might fairly raise the question, whether if they were given at all they were given in the usual and proper manner. On the other hand, as we have said, it was the duty of the plaintiff before crossing to stop, look and listen for the approach of trains; it was his duty to do so immediately before crossing, and as the learned Court instructed the jury, "if he could not see up and down the track from any point upon the road before reaching the rails, it was his duty to go upon the track itself, and look and listen before attempting to drive his team across." But there is evidence to show that this is substantially what he did do. No one ever supposed, and this Court has certainly never said, that a traveller's duty to stop, look and listen can only be performed at the exact instant when his horses' heads are at the rail. No man of ordinary discretion would drive his team directly up to a railroad track, upon which trains may momentarily be expected to pass, and whilst in that dangerous place stop and look and listen for the approach of trains immediately before crossing in any literal or absolute sense. No team of horses, gentle or otherwise, could be restrained in such a position during the passage of a train. This rule, which has been recognized as imperative, is a reasonable one, and is entitled to a reasonable construction.

The evidence is that the track could not be seen from Berwick street, except at the crossing, that Brandtmaier stopped within six or seven steps of the railroad, that he got out of his sleigh, went upon the track, looked up and down the road and listened for trains; that hearing none he returned quickly, got into the sleigh and immediately attempted the passage over the track, when the accident occurred; the ascertainment of the facts was for the jury. It was for the Court to determine, whether the facts alleged amounted to a compliance with the imperative rule of duty, imposed by law; and for the jury to decide whether such a state of facts existed. We are of opinion, if the facts be as stated, that Brandtmaier exercised all the precautions which could reasonably be required of him.

After having instructed the jury, as hereinbefore quoted, the learned judge proceeds as follows: " In case you should be of the opinion that the defendant had exercised every care in guarding this crossing, or of giving proper warning to travellers of the approach of its trains, and that the accident which

resulted to the plaintiff could not have been prevented by any act of the defendant's, then of course that would be an end of this case."

There can be no doubt whatever as to the entire accuracy of this statement; it is quite clear that if the defendant "exercised every care in guarding the crossing," and in "giving proper warning to travellers of the approach of the train;" if "the accident could not have been prevented by any act of the defendant," "then, 'of course,' that would be the end of the case." It is objected, however, that this was misleading in its effect upon the jurors. It is argued that the jury might, and probably did, accept this instruction, as a distinct and positive enunciation of a rule, fixing the measure of care which the company was bound to exercise for the public safety, and if so, that the rule was not correctly stated. There is no absolute rule as to what constitutes negligence; a higher degree of care is demanded under some circumstances than under others; in this case, however, it was the duty of the defendant to exercise reasonable care, care according to the circumstances, and the question was for the jury. There was no duty imposed upon the company to so guard this crossing, that the accident could not by any possibility have occurred; nor was it to be esteemed negligence that the accident occurred, if by any act of the defendant, which may now be suggested, it might have been prevented. If the court intended, or the jury was led to suppose, that the company was to be judged according to this standard, it is clear that the judgment should be reversed. The question, however, is upon the whole charge; where particular instructions on a given point are not asked for, the court will be reviewed upon the general effect of the charge, and not upon sentences or paragraphs selected from it; if as a whole the charge was calculated to mislead, there is error in the record; if not, there is none: Del. & Lack. R. R. Co., 6 Casey, 454.

In the opening part of the charge the plaintiff's case is thus stated by the learned judge of the court below: "The plaintiff supports his claim that the defendant failed to exercise ordinary care in the running of Train No. 12 upon the night of March 3d, 1884, by two allegations. First, that the train was running at an improper and unusual rate of speed; and second, that no notice of its approach was given either by the ringing of a bell or the blowing of a whistle."

Thus at the outset, he distinctly declares that the plaintiff's claim is founded upon an allegation of want of *ordinary care* only, and states specifically the two matters in respect of which this want of ordinary care is alleged  In another part of the charge the learned judge says:

[Lehigh Valley Railroad Co. *v.* Brandtmaier.]

"While plaintiff had a right to travel the highway, the defendant had a right to do the same with its trains. But in doing so they were bound to exercise *ordinary care* and *prudence;* and if the company or its agents failed to exercise *such* care and prudence, there was negligence for which the company may be held liable."

. The learned judge then proceeds to the consideration of the case, upon the two distinct and only matters alleged as constituting negligence on part of the company; first, that the train at the crossing of Berwick street was moving at a higher rate of speed than was reasonably consistent with the public safety; and, second, that no warning was given of the train's approach. Referring to the rate, he instructs the jury that there is no fixed rule; that the speed of a train may vary according to the locality; what would be safe at one point would be imprudent at another; and, in substance, that the jury must consider whether the rate was reasonable, under the circumstances.

After a reference to the testimony of the witnesses and to their respective opportunities to know, he submitted in the plainest manner the question "whether upon the night of the accident a proper notice of the approach of the train was given." The whole theory and tenor of the charge, outside of the paragraph assigned for error, is that the company were bound to the exercise of "ordinary care and prudence" only, and the learned judge in the expressions "every care" and "any act," used in the paragraphs referred to, manifestly meant "every care," and "any act," which, under the circumstances, ordinary prudence would have suggested; and we think the jury must certainly have so understood him; especially as the only alleged acts of negligence were in other parts of the charge separately discussed, and correctly presented, for their consideration. The language, owing to the ellipsis, is perhaps unfortunate, but, taken with the remaining portion of the charge, it is susceptible of no other meaning than we have given it, and the jury could not have been misled by it.

The case was one, we think, for the determination of the jury, under all the evidence. We find nothing on the record which we think should work a reversal of the judgment.

The judgment is therefore affirmed.